**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **WILLIAM C. HUNTER** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 08-00666-KD-M** |
| | ) | |
| **CITY OF MOBILE** | ) | |
| | ) | |
| **Defendant .** | ) | |

**ORDER**

Before the court are Defendant City of Mobile (the "City")'s motion for summary judgment (Docs. 39, 40, 41, 42 & 43) and reply in support of the motion (Doc. 57, 58) as well as Plaintiff William C. "Bill" Hunter ("Hunter")'s response in opposition (Docs. 51, 53 & 54). For the reasons set forth below, the motion for summary judgment is **GRANTED in part** and **DENIED in part**.

**I. Summary Judgment Standard**

Summary judgment should be granted only if "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).[1] The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The party seeking summary

---

[1] Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted:

> if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

FED. R. CIV. P. 56 (c).

judgment also always bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted). The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Secretary of Dep't of Children & Family Serv., 358 F.3d 804, 809 (11th Cir. 2004), cert. den., 534 U.S. 1081 (2005).

## II. Analysis

### A. Procedural Background

Hunter alleges that the City discriminated against him on the basis of race and age in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., Section 1981 of Title 42 of the United States Code, and the Fourteenth Amendment to the United States Constitution. (Doc. 1, ¶¶ 2 & 16). This Court's jurisdiction obtains pursuant to Title 28 United States Code Sections 1331 and 1343. (Id.; see also discussion infra, pp. 9-11).

### B. Factual Background

#### 1. Facts Giving Rise to this Suit

In the City of Mobile Fire-Rescue Department ("Mobile Fire-Rescue")'s chain of command, Deputy Fire Service Chief ("Deputy Chief") is the third highest position, directly below the Assistant Fire Chief, who in turn reports directly to the Fire Chief. (Doc. 40-2, pp. 5-6 & 16 (Dean Dep. 9:20-10:23 & 93:3-10)). When the events giving rise to this litigation transpired, William "Billy" Pappas ("Chief Pappas") was the Assistant Fire Chief and Stephen Dean ("Chief Dean") was the Fire Chief. (See Doc. 40-3 (Pappas Dep.); Doc. 40-2 (Dean Dep.)).

In January of 2007, Mobile Fire-Rescue requested a certification from the Mobile County Personnel Board ("Personnel Board") to fill an impending Deputy Fire Service Chief ("Deputy Chief") vacancy resulting from Chief Charles Parmar's retirement. (Doc. 40-1 (Personnel Action Request); Doc. 40-2, p. 7 (Dean Dep. 18:4-23)). On April 2, 2007, the Personnel Board issued a promotional announcement for the position of Deputy Chief. (Doc. 40-4 (Announcement 11741)).

Generally, after the Personnel Board receives applications in response to such a promotional announcement, the applications are reviewed to ensure minimal qualifications are met. (Doc. 40-8, pp. 3-4 (Dees Dep. 11:1-12:23)). Minimally qualified applicants are then subjected to an appraisal process. (Id.). The names of applicants that meet a minimal score during the appraisal process are then placed on a register, a master list of applicants that is maintained by the Personnel Board for each job. (Id. at 5 (Dees Dep. 13:7-9)). The register, in turn, is used to create a Certification of Eligibles. (Doc. 40-2, pp. 17-18 (Dean Dep. 97:18-98:5); Doc. 40-9, p. 13 (Gordon Dep. 49:4-7)). When a single vacancy is anticipated, a Certification of Eligibles containing a list of up to ten qualified candidates issues. (Doc. 40-9, pp. 6, 7, & 18 (Gordon Dep. 35:14-23, 37:17-23 & 49:8-

21)). Although every candidate listed on the certification is eligible for the vacant position, for a position such as Fire-Rescue Deputy Chief, the list is ranked according to the candidates' scores resulting from the appraisal process . (Id.; Doc. 40-8, pp. 6-7 (Dees Dep. 14:20-15:19); Doc. 53-2, p 5 (Weekley Dep. 17:1-12); Doc. 53-4, pp. 17-23 (Gordon Dep. 26:8-32:12)).

Applicants for this particular Deputy Chief job announcement were appraised solely on the basis of oral interviews. (Doc. 40-8, p. 17 (Dees Dep. 73:1-15); Doc. 40-9, p. 8 (Gordon Dep. 43:7-11)). The Personnel Board chose three individuals to conduct the round of interviews that resulted in the register created for this position. (Doc. 40-8, p. 11 (Dees Dep. 38:5-18)). These panelists were individuals employed in fire-rescue-related positions in three different municipalities outside the Mobile metropolitan area. (Doc. 40-10, pp. 6-7 (Hunter Dep. 59:22- 60:3); see also Doc. 51, p. 4; Doc. 40-9 p. 9 (Gordon Dep. 44:1-12)). During each candidate's 45-minute interview, the panelists asked a specific set of questions formulated by the Personnel Board. (Doc. 40-9, pp. 4-5 & 12 (Gordon Dep. 21:11-18, 23:1-13 & 47:12-20)). Upon request, the panelists were permitted to access the candidates' personnel files for the sole purpose of verifying their education. (Doc. 40-9, pp. 10-11 (Gordon Dep. 45:10-46:22)).

The result of this process was a Certification of Eligibles issued by the Personnel Board. (Doc. 40-11, Certification of Eligibles). The Certification of Eligibles, which is dated July 17, 2007, ranked the candidates eligible for the Deputy Chief position based on the panelists' assessments, which in turn were based on criteria established by the Personnel Board. (Id.; Doc. 42, p. 3; Doc. 40-9, p. 5 (Gordon Dep. 23:7-13). Paul R. "Randy" Smith ("Smith"), white and born in 1966, was ranked first. (Doc. 40-11; Doc. 1, ¶ 10 (Complaint); Doc. 40-2, p. 12 (Dean Dep. 67:2-8); Doc. 40-8, pp. 9 (Dees Dep. 26:4-23); Doc. 40-12 (Memo from Interview Committee); Doc. 40-17

(Announcement 11741)). Plaintiff Hunter, white and born in 1947, was ranked second. (Id.) Donald ("Don") Meyers ("Meyers"), white and born in 1953, was ranked third. (Id.). Govan "Mike" Trenier ("Trenier"), black and born in 1962, was ranked sixth. (Id.).

The eligible candidates were then subjected to a second round of oral interviews. This time, the interviews were conducted by Mobile Deputy Chief of Police Jim Barber ("Barber"), Mobile Director of Urban Development Laura Clarke ("Clarke"), and Citismart Coordinator for the City of Mobile Bill Harkins ("Harkins"). (Doc. 40-12 (Memo from Interview Committee); Doc. 40-3, pp. 4-5 (Pappas Dep. 53:10-54:23)). Before this second round of interviews, the panelists were briefed on the duties of a Deputy Fire Chief. (Doc. 40-13, p. 6 (Barber Dep. 42:1-5)). These second-round panelists were provided with the candidates' resumes and were given a list of questions that Chief Pappas read to the candidates during the interviews. (Id. at 3 (Barber Dep. 15:17-23); Doc. 40-10, pp. 8-9 (Hunter Dep. 69:10-70:11)). The panelists also had the opportunity to ask questions during the interview. (Doc. 40-15, p. 3 (Harkins Dep. 40:16-19)). This second panel recommended Meyers, Trenier, and Smith for the Deputy Chief position.[2] (Doc. 40-12 (Memo from Interview Committee)).

Clarke stated in a deposition that her recommendation to promote Meyers was based on a perception that he was informative, articulate, passionate about the Fire Department, and goal-

---

[2]Although only one vacancy was anticipated when Mobile Fire-Rescue requested a certification from the Personnel Board, three Deputy Chief positions were ultimately filled as a result of the process. (Doc. 40-8, pp. 12-13 (Dees Dep. 53-54); Doc. 40-5, pp. 4-5 (Westerburg Dep. 58-59)). One of these additional vacancies was created after the City requested that an existing Fire Marshall position be classed as a Deputy Chief position in order to achieve a consistent rank structure within Mobile Fire-Rescue; the Fire Marshall had been performing Deputy-Chief-level work. (Doc. 40-5, p. 6 (Westerburg Dep. 62); Doc. 40-6 (Personnel Action Request); Doc. 40-2, p. 8 (Dean Dep. 28)). The Personnel Board approved the City's request, creating an additional Deputy Chief position. (Doc. 40-7 (Letter from Donald Dees, Mobile County Personnel Director, to Samuel L. Jones, Mayor of the City of Mobile (Jun. 19, 2007)).

oriented. (Doc. 40-14, pp. 5-6 (Clarke Dep. 41:18-42:8)). Regarding Trenier, Clarke recalled that he "seemed very articulate, very knowledgeable about the fire department overall and some particular operations with . . . the CitiSmart program and the accountability aspect . . . of the job." (Id. at 6 (Clarke Dep. 42:9-23)).

Harkins believed Meyers was right for the job because he was well educated and had an extensive medical background. (Doc. 40-15, p. 5 (Harkins Dep. 48:2-14)). Harkins emphasized that he recommended Trenier because he knew Trenier had done "quality" work with the CitiSmart program, his resume reflected very strong organizational skills, and he held a bachelor's degree. (Doc. 40-15, p. 6 (Harkins Dep. 49:11-23)). Harkins stated that he had no recollections of discussing Hunter with the other panelists. (Id., p. 4-5 (Harkins Dep. 47:5-48:1)).

Barber, who explained that he adjudged administrative talent more important than operational skill for this particular post, indicated that Meyers and Trenier appeared to be the strongest administrators within the group interviewed. (Doc. 40-13, pp. 7-13 (Barber Dep. 55:2-62:3)). Barber stated that he did not remember much about Hunter, admitting that he could clearly remember only those that he "thought were probably the least qualified and those that . . . were probably most." (Id., p. 13 (Barber Dep. 62:4-12)).

Chief Dean did not attend the meeting during which the second panel discussed candidates and decided upon their recommendations. (Doc. 40-13, p. 16 (Barber Dep. 82:3-19)). However, he submitted to the Mayor the same list of names that the panel had produced, recommending that Meyers, Trenier, and Smith be promoted to Deputy Chief. (Doc. 40-2, p. 13 (Dean Dep. 70:14-16)). When asked in his deposition "why . . . Trenier . . . [wa]s more capable and more qualified for th[e] promotion than [] Hunter," Chief Dean stated that he considered it "important" that Trenier has a

bachelor's degree, while Hunter has an associate's degree.  (Id., p. 14-15 (83:7-84:2)).  Chief Dean also pointed out that "Meyers has a bachelor's degree and a nursing degree," and that "Smith has a bachelor's degree and he's a paramedic."  (Id. at 84:4-9).  Chief Dean impliedly compared the education of the three men promoted to Deputy Chief to Hunter's education: "That in itself on those three are stronger than an AA degree."  (Id. at 84:10-11).

Mobile Mayor Samuel L. Jones made the final decision to promote Trenier, Meyers, and Smith. (Doc. 40-5, p. 3 (Westerberg Dep. 47:15-19); Doc. 40-2, p. 5 (Dean Dep. 9:8-15)).  The three new deputy chiefs were promoted on December 8, 2007.  (Doc. 40-2, p. 9 (Dean 32:9-13)).

Hunter filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 8, 2008 and was issued a right to sue notice on September 26, 2008.  (Doc. 1, p. 6 (citing EEOC Dismissal and Notice of Rights, Charge # 425-2008-00384 (Doc. 43-2)).  This suit, which was filed on November 14, 2008, timely ensued.  (Id.)

## 2. Discrimination Litigation Involving the City and Chief Dean

Two prior racial employment discrimination lawsuits filed by white plaintiffs against the Chief Dean and the City led to federal jury findings of discrimination. See Silvester v. City of Mobile, Civ. Action No. 1:02-987-CG-M; Stringfellow v. City of Mobile, Civ. Action No. 1:04-281-CG-M.  The Silvester case, which involved claims that Dean had promoted a lower ranked black employee (Trenier) over a white employee, ultimately resulted in a verdict for the plaintiff. In Stringfellow, Chief Dean had promoted three employees, two white employees and one black employee, to the position of District Chief.  The plaintiffs offered direct and indirect evidence of discrimination. In order to promote the black employee, the plaintiffs argued, Chief Dean had to bypass four white employees who were more qualified.  Dean offered subjective reasons for the

decision, identifying criticisms of the four white candidates that had been ranked above the black employee. The <u>Stringfellow</u> "jury returned its verdict and found that defendant had intentionally discriminated against each of the four plaintiffs on the basis of race, but that the defendant would have denied each of the four plaintiffs a promotion for other reasons, even in the absence of consideration of the particular plaintiff's race." (<u>Stringfellow</u> Order Denying Motion for Entry of Partial Judgment, Doc. 116, p. 1 ( Jul. 28, 2006)). However, that jury proceeded to award damages to each plaintiff. (<u>Id.</u>) The <u>Stringfellow</u> court granted a new trial, finding that the jury interrogatories were erroneous because they allowed the jury to award damages although they had found mixed motive. (<u>Stringfellow</u> Order Granting a New Trial, Doc. 99, pp. 5-6 (Jun. 20, 2006)). During the second trial, the parties settled the <u>Stringfellow</u> dispute. (<u>Stringfellow</u> Order Dismissing Case with Prejudice, Doc. 120, p. 1(August 23, 2006)).

Finally, a third suit against Chief Dean and the City, in which two white employees alleged race and age discrimination after they were passed over promotion in favor of a black employee, settled after the undersigned found that the plaintiffs had presented sufficient evidence of pretext to withstand summary judgment. City, <u>Smith et al. v. City of Mobile</u>, Civ. Action No. 1:06-93-KD-M, 2007 WL 2580516, at * 10 (Sep. 5, 2007).

### 3. Chief Dean's Prior Comments

Hunter cites a number of Chief Dean's prior comments, which he claims evince a "willingness to violate the law." (Doc. 51, p. 13). In a 2003 deposition obtained from Chief Dean in the course of the <u>Silvester</u> litigation, Chief Dean affirmed that "we need to enhance minority representation across the board." (Doc. 54-1, pp. 15-16 (Dean Dep. 80:11-81:16)). In 2006, Chief Dean gave an oral presentation to the County Commission as part of Mayor Jones' Transition Task

Force.  The final report, dated January 31, 2006, indicates that Dean told the County Commission "[w]e focus on hiring minorities, and they are hired if they pass all of the tests." (Doc. 54-4); <u>see also</u> <u>Smith</u>,  2007 WL 2580516, at * 4.  And in a deposition obtained during the <u>Stringfellow</u> litigation, Captain LeAnn Tacon ("Captain Tacon") reported that Chief Dean had explained to her "why [he] promoted who [he] promoted," stating that he had promoted an employee named Johnny Morris because "let's face it . . . Johnny Morris is black."  (Doc. 54-3, pp. 2-3 (Tacon Dep. in <u>Stringfellow</u> litigation, at 23:18-24:20)).   The Court also notes that Captain Tacon testified in her deposition that Chief Dean stated he had promoted  Randy Smith "because [he (Chief Dean)] needed youthfulness down here."   (<u>Id.</u> at 23:18-24:18).

### C.  Conclusions of Law

#### 1.  Race Discrimination

##### a.  Disparate Treatment

###### i.  Jurisdiction over Section 1981 claims

Hunter brings claims for race discrimination based on and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e <u>et seq.</u>. (Doc. 1, ¶ 2).  Hunter's complaint also refers to the Fourteenth Amendment of the United States Constitution and Section 1981 of Title 42 of the United States Code.  (<u>Id.</u>, ¶¶ 2 & 16).  However, the complaint fails to specifically invoke Section 1983 of the same title.  Claims for violation of rights protected by the Fourteenth Amendment are not directly actionable but are brought by suit under Section 1983 of Title 42 of the United States Code. <u>See</u> <u>Collins v. City of Harker Heights, Tex.</u>, 503 U.S. 115 (1992).  Likewise, Section 1983 "provides the exclusive federal damages remedy for violation of the rights guaranteed by § 1981."  <u>Vason v. City of Montgomery, Ala</u>.  240 F.3d 905, 906 n. 1 (11th Cir. 2001) (per curiam) (citing <u>Butts v.</u>

County of Volusia, 222 F.3d 891, 894 (11th Cir. 2000)'s holding that the Civil Rights Act of 1991 did not affect the continuing validity of Jett[v. Dallas Independent School District, 491 U.S. 701 (1989)], a Supreme Court opinion holding that § 1983 provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor.); see also Webster Greenthumb Co. v. Fulton County, Ga., 283 F.3d 1254, 1256 (11th Cir. 2002) ("Section 1981 is enforceable against a municipality through 42 U.S.C. §1983"); Anderson v. Bd. of School Comm'rs of Mobile County, Ala., 78 F. Supp. 2d 1266, 1269-70 (S.D. Ala. 1999) (dismissing claims alleged under Section 1981 "because plaintiffs did not invoke § 1983 in their complaints").

Because "Section 1983 is the sole jurisdictional vehicle for bringing Section 1981 claims against governments," this Court lacks jurisdiction, under the current complaint, to consider Hunter's claims lodged under Section 1981. Webster Greenthumb Co. v. Fulton County, Ga., 112 F. Supp. 2d 1339, 1382 (N.D. Ga. 2000); see also Fed. of African Am. Contractors v. City of Oakland, 96 F.3d 1204, 1207 (9th Cir. 1996) (noting that in Jett the Supreme Court "articulated . . .[an] important jurisdictional principle[]" by holding "that 42 U.S.C. § 1981 does not provide an independent federal cause of action for damages against local governmental entities; instead, where a claim is brought against a municipality, 42 U.S.C. § 1983 provides the exclusive federal damages remedy for the violation of rights guaranteed by 42 U.S.C. § 1981." Id.).

However, at this stage, Hunter's Section 1981 claims have no practical effect on the summary judgment motion analysis because the standard used to analyze disparate treatment claims made in the employment context under Title VII, which Hunter properly alleged, is identical to that employed to analyze claims properly lodged against a municipality pursuant to Sections 1981 and

1983.[3]  See Rice-Lamar v. City of Fort Lauderdale, Fla., 232 F.3d 836, 843 n.11 (11th Cir. 2000)

(citing Cross v. Alabama, 49 F. 3d 1490, 1507-08 (11th Cir. 1995); Peterson v. BMI Refractories,

132 F.3d 1405, 1412 n. 13 (11th Cir. 1998)).   Moreover, it appears that the City construes Hunter's

complaint to include Section 1983 claims (see Doc. 41, pp. 7, 13), and the defendant does not

advance any damage-related arguments in its motion for summary judgment (See id.).[4]

### ii.  Disparate Treatment Analysis

In the absence of direct evidence of discrimination, as in the case at bar, courts assessing

disparate treatment claims on summary judgment apply the familiar burden-shifting analysis of

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  In order "to prove discriminatory

treatment through circumstantial evidence: (1) a plaintiff must first make out a *prima facie* case, (2)

then the burden shifts to the defendant to produce legitimate, nondiscriminatory reasons for the

adverse employment action, and (3) then the burden shifts back to the plaintiff to establish that these

reasons are pretextual."  Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1375 (11th  Cir. 1996)

(internal citations omitted).

To make out a *prima facie* case of discriminatory failure to promote,[5] Hunter must show that:

---

[3]  The City of Mobile has not specifically addressed Section 1983's additional constraint on
section 1981 claims against governmental entities—that the discrimination complained of be a custom or
policy of the governmental entity.  See Monell v. Department of Social Services of New York, 436 U.S.
658, 694-95 (1978).

[4]  Although the analytical framework under both Title VII and Section 1981 is the same, the
remedies available under each statute differ.   See Goldsmith v. Bagby Elevator, Co., Inc., 513 F. 3d
1261, 1285 (11th Cir. 2008) (quoting Swinton v. Potomac Corp., 270 F. 3d 794, 820 (9th Cir. 2001)) ("in
contrast to Title VII, 'Congress has not seen fit to impose any recovery caps on cases under § 1981 (or §
1983), although it has had ample opportunity to do so since the 1991 amendments to Title VII.'").

[5]  Hunter's complaint also contains another allegation that sounds in disparate treatment:
"Defendant has employed and applied the City's personnel policies in a racially discriminatory manner.
African Americans are treated more favorably than Caucasians and have been shown leniency in situations

11

" (1) he was in a protected group; (2) he was not given the promotion; (3) he was qualified for the position and (4) someone outside of the protected group was given the position." <u>Standard</u>, 161 F.3d 1318, 1333 (11th Cir. 1998) (citing <u>Coutu v. Martin County Comm'r</u>, 161 F.3d 1318 (11th Cir. 1995)).  Hunter cannot establish a *prima facie* case of racial discrimination with respect to the promotions of Meyers and Smith, who are both white and therefore cannot be considered "outside of [Hunter's] protected group."  However, the City does not challenge Hunter's *prima facie* showings with respect to the promotion of Trenier, who is black.  (<u>See</u> Doc. 41, p. 8).

The City argues instead that it promoted Trenier for legitimate, nondiscriminatory reasons, namely, that Trenier was promoted because he "was articulate, organized, . . . well educated . . . . [and] extremely knowledgeable about the Fire Department and the City of Mobile's CitiSmart Program." (Doc. 41, p. 11).  Most of the City's articulated reasons for promoting Trenier over Hunter are subjective.  However,

> . . . [s]ubjective reasons can be just as valid as objective reasons . . .
>
> . . . .
>
> Nonetheless, we are mindful of the requirement articulated by the Supreme Court in <u>Burdine</u> that "the defendant's explanation of its legitimate reasons must be clear and reasonably specific" so that "the

---

which, under the Department's policies, called for severe punishment." (Doc. 1, ¶ 12).  The City moved for summary judgment on this claim (<u>see</u> Doc. 41, p. 12), but Hunter's opposition to the motion contains no corresponding response that is supported by evidence.  Accordingly, summary judgment is **GRANTED** as to the allegations contained in paragraph 12 of Hunter's complaint, which Hunter has failed to prosecute. <u>See</u> <u>Ledford v. Peeples</u>, 568 F. 3d 1258, 1285 (11th Cir. 2009) (treating as abandoned claims not argued in briefs); <u>see</u> <u>also</u> <u>Jucleus v. City of North Miami</u>, 2009 WL 3818430, * 7, n. 3 (S.D. Fla. 2009) (same).
    Based on Hunter's response to the motion for summary judgment, the Court further understands that Hunter's sole disparate treatment claim turns upon the City's failure to promote him.  (<u>See</u> Doc. 51, p. 20 ("the challenged employment action here is the promotion of Trenier to the exclusion of Plaintiff.")).  Because Hunter has failed to prosecute any other disparate treatment claims, summary judgment is hereby **GRANTED** as to any other putative claims.

> plaintiff be afforded a full and fair opportunity to demonstrate pretext." Burdine, 450 U.S. at 258, 101 S.Ct. at 1096 (quotation omitted). A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion.

Chapman v. AI Transport, 229 F.3d 1012, 1034 (11th Cir. 2000). The reasons offered by the City are legitimate and non-discriminatory.

The City insists that Chief Dean "chose to turn over the decision[-]making process to the [second] panel," pointing to the fact that he "submitted the exact same names [that the panel had recommended] to the Mayor." (Doc. 42 p. 4 (citing Doc. 40-2, p. 11 (Dean Dep. 47)). Indeed most of the subjective reasons that the City relies upon to justify Trenier's promotion were offered by the panelists. (See Doc. 40-14, p. 6 (Clarke Dep. 42:9-23) (Trenier "seemed very articulate, very knowledgeable about the fire department overall and some particular operations with . . . the CitiSmart program and the accountability aspect . . . of the job."); Doc. 40-15, p. 6 (Harkins Dep. 49:11-23) (Trenier had done "quality" work with the CitiSmart program; his resume reflected very strong organizational skills);(Doc. 40-13, pp. 7-13 (Barber Dep. 55:2-62:3) (Meyers and Trenier appeared to be the strongest administrators within the group interviewed)). However, the city also states that Hunter did not have the specific educational background; a reason relied upon by Chief Dean. (Doc. 41, p. 11)

Upon consideration the court finds that Hunter has presented sufficient evidence that could lead a reasonable juror to conclude that the City's stated reasons for promoting Trenier over Hunter are pretextual. See Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981) (a plaintiff may "indirectly" satisfy the ultimate burden of persuading the court that he has been the victim of intentional discrimination "by showing that the employer's proffered explanation is

unworthy of credence." Id.).  Specifically, Hunter casts aspersion on the City's account of the

promotional decision-making process by citing the deposition testimony of Mobile Fire-Rescue

Captain Debbie Bryars ("Captain Bryars").  (See Doc. 51(citing Doc. 54-13, pp. 3-4 (Bryars Dep.

7-8)).  Although there is evidence that the second panel did not conduct its interviews until August

7th and 8th, 2007 and did not submit its recommendations to Chief Dean until later that month,

Captain Bryars stated that in approximately mid-July she "overheard  the chief [(Dean)] tell Mike

[Trenier] that he would need to soon be getting more stripes added to his jacket, his dress uniform,"

which Bryars took to mean that Trenier was "[o]bviously . . . going to be promoted."  (Id. at 8:2-19;

Docs. 40-12 & 54-12 (Memo from Interview Committee); Doc. 54-11 ("Proposed Qualifications of

Govan M. Trenier, Jr. Presented for Consideration in Promotion to Deputy Fire Service Chief[,]

Submitted August 7, 2007"); Doc. 40-11 ("Certification of Eligibles to Appointing Authority"

("10[:]30 Tues 7th" written next to Trenier's name and what appear to be other scheduling notations

written next to other candidates' names alongside "Tues 7th" and "Wed 8th")).  If the fact-finder

believes Captain Bryars' testimony, it could reasonably refuse to accept the City's position that

Chief Dean assigned the decision to the panel and conclude instead that Chief Dean[6] had already

decided to promote Trenier before the panel even had a chance to formulate its recommendations.

Thus, Chief Dean's stated reliance on the panel's reasons for choosing Trenier is questionable.

Moreover, a reasonable juror could also conclude that the sole reason cited by Chief Dean

for Trenier's promotion over Hunter—education—is also pretextual.  As noted above, when asked

in his deposition "why  . . . Trenier . . . [wa]s more capable and more qualified for th[e] promotion

---

[6]  Although the mayor must approve Fire-Rescue promotional recommendations, Chief Dean
indicated in his deposition testimony that the mayor has not "turned down or denied a[ny of the]
recommendation[s]" that Dean has made "in a promotional setting in the last five years.  (Doc. 53-13, p. 5
(Dean Dep. 9:16-20)).

than [] Hunter," Chief Dean stated that he considered it "important" that Trenier has a bachelor's degree, while Hunter has an associate's degree. (Doc. 40-2, p. 14-15 (Dean Dep. 83:7-84:2)). But in the next breath, Chief Dean admitted that he had "ask[ed] the Personnel Board to remove as a requirement for the fire administrator's job the requirement of a bachelor's degree." (Id. at 15 (Dean Dep. 84:15-19)). And during a previous round of Mobile Fire-Rescue promotions that resulted in the Smith litigation, Chief Dean recommended that the City promote to Deputy Chief a black individual who held only an associate's degree over two white candidates, each of whom held bachelor's degrees. See Smith et al. v. City of Mobile, Civ. Action No. 1:06-93-KD-M, 2007 WL 2580516, * 7 (Sep. 5, 2007).[7] These earlier actions are consistent with statements Chief Dean made during the Silvester litigation. In his deposition for the Silvester suit, Dean indicated that he did "not necessarily" believe that attaining a bachelor's degree makes an individual more qualified for a managerial position than one who merely holds an associate's degree. (See Doc. 54-1, pp. 12-13 (Dean Dep. in Silvester litigation, at 44:15-45:21)).[8] A reasonable juror could conclude that Chief Dean's prior statements and actions belie his stated reason for promoting Trenier over Hunter in this instance. See Smith, 2007 WL 2580516, at *8 (citing Ross v. Rhodes Furniture, Inc., 146 F. 3d 1286, 1291 (11th Cir. 1988) (potentially discriminatory comments not directly related to the employment decision at issue could contribute to a circumstantial showing of discriminatory intent);

---

[7] The Court notes that Mobile County Personnel Board Personnel Director Donald Dees affirmed in his deposition that the "types of standards that are supposed to show objectivity" in the hiring process—at least the portion of the process in which the Personnel Board is involved—have not "changed since the test was administered in the Smith-Glisson matter . . . ." (Doc. 53-2, p. 6-7 (Dees Dep. 21:17-22:2).

[8] It is also worthy to note that the first set of panelists, which ranked Hunter first on the Certification of Eligibles, could, upon request, review the candidates' resumes during the interview process for the purpose of verifying their education. (Doc. 40-9, pp. 10-11 (Gordon Dep. 45:10-46:22)).

see also Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1229-30 (11th Cir. 2002); Rojas v.
Florida, 285 F. 3d 1339, 1343 (11th Cir. 2002).

Accordingly, the court finds that Hunter has presented sufficient evidence of pretext to
withstand the City's motion for summary judgment on the claim of disparate treatment based on
race, which is **DENIED**.

### b. Disparate Impact

Hunter alleges that alterations and amendments to the City's hiring process have "enable[d]
the City to preferentially promote African-Americans over . . . Caucasian employees" and that the
City "has . . . employed and applied [its] personnel policies in a racially discriminatory manner."
(Doc. 1, ¶¶ 11-12). He claims that "the discriminatory administration of the promotional process
. . . violate[s] Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. . .
.." (Id., ¶ 16).[9] Although the City maintains that "it is not clear if [a disparate-impact] theory of
liability is being asserted by the Plaintiff," the defendant acknowledges that certain allegations in
Hunter's complaint "could fit under the rule of disparate impact." (Doc. 41, p. 14).

Title VII disparate impact claims "[i]nvolve[] facially neutral employment practices that have
significant adverse effects on protected groups . . . without proof that the employer adopted those
practices with a discriminatory intent . . . ." Reeves v. C.H. Robinson Worldwide, Inc., No. 07-
10270, ___ F. 3d ___, 2010 WL 174074, * 5 (11th Cir. Jan. 20, 2010) (internal quotation omitted).
In order to establish a *prima facie* case of disparate impact Hunter must "begin by identifying the

---

[9] A plaintiff proceeding on a theory of disparate impact is limited to Title VII and cannot take
advantage of Section 1981. See Dickinson v. Springhill Hospitals, Inc., 397 F. Supp. 2d 1337, 1342
(S.D. Ala. 2005) (citing Larkin v. Pullman-Standard Div., Pullman, Inc., 854 F. 2d 1549, 1561 (11th Cir.
1998), overruled on other grounds by Swint v. Pullman-Standard, Inc., 493 U.S. 929 (1989)).

specific employment practice that is challenged." <u>Watson v. Fort Worth Bank & Trust</u>, 487 U.S. 977, 994 (1988). Then, he must prove causation by "offer[ing] statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." <u>Id.</u>; <u>see also</u> <u>Cooper v. Southern Co.</u>, 390 F. 3d 695, 716 (11th Cir. 2004), <u>cert. denied</u>, <u>Cooper v. Southern Co.</u>, 126 S. Ct. 478 (2005), <u>overruled on other grounds</u>, <u>Ash v. Tyson Foods, Inc.</u>, 546 U.S. 454, 457-58 (2006) (citing <u>E.E.O.C. v. Joe's Stone Crab, Inc.</u>, 220 F. 3d 1263, 1274 (11th Cir. 2000) ("To prove disparate impact, a plaintiff must establish the existence of a statistically significant disparity among members of different groups affected by a type of employment decision; a specific, facially neutral employment practice involved in the decision; and a causal nexus between the facially neutral employment practice and the statistically significant disparity.")); <u>see also</u> <u>Lee v. Fla., Dep't of Children and Family Servs.</u>, 135 Fed. Appx. 202, 205 (11th Cir. 2005) (per curiam).

Hunter challenges the City's alleged decisions to: (a) change the "Rule of 3" to a "Rule of 10"[10]; (b) "[r]educ[e] the minimum qualifications for numerous jobs including the Deputy Chief position"; and (c) "chang[e] from objective to subjective tests in the promotional process." (Doc. 1, ¶ 11). However, Hunter fails to offer any evidence, much less statistical evidence, to suggest that

---

[10] The "Rule of 10" refers to the City's practice of certifying for promotion a total of nine qualified individuals plus an additional qualified individual for each position that the jurisdiction seeks to fill. In other words, a jurisdiction such as Fire Rescue has a "right" to have 10 qualified individuals certified for each vacant position under the Rule of 10. (Doc. 53-3, p. 4-5 (Dees Dep. 13:19-14:19). Sometimes, as in this instance, fewer than 10 people are qualified for the position. The Department has a right to request that the Personnel Board conduct a second examination in order to produce a list of 10 names, although the Department is not required to do so. (Doc. 53-2, pp 6-8 (Weekley Dep. 18:21-19:19)). Previously, the City employed a "Rule of 3," under which a total of two qualified individuals plus an additional qualified individual would be certified for each position that the jurisdiction sought to fill. (<u>Id.</u>, pp. 7-8 (19:20-21:15)).

specific City practices "ha[ve] caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." Instead, Hunter merely alludes to "murky and collusive" methods allegedly "work[ing] to insure" that "a combination" of races—both white and black—are promoted. (Doc. 51 at 10).[11] Even "assuming that [Hunter] identified a specific, facially-neutral employment practice, he has failed to demonstrate a statistical disparity in the racial composition of the employees benefitting from the practice and those qualified to benefit from the practice." Price v. M&H Valve Co., 177 Fed. Appx. 1, 14 (11th Cir. 2006) (per curiam) (citing Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 996-97 (1988)).

Accordingly, summary judgment is **GRANTED** on Hunter's disparate impact claims.

### c. Pattern and Practice

Hunter claims that the City "has . . . engaged in a pattern and practice of promoting African-Americans to positions of authority based on their race," alleging specifically that "Trenier was the recipient of . . . a discriminatory promotion in April[,] 2002[, t]hat . . . led to a jury verdict against the City for violating Title VII." (Doc. 1, ¶ 13).

Because "pattern or practice cases are a variant of the disparate treatment theory . . . proof of discriminatory motive is critical." Joe's Stone Crab, Inc., 220 F. 3d at 1274 (internal quotation marks omitted) (quoting Lujan v. Franklin County Bd. of Educ., 766 F. 2d 917, 929 (6th Cir. 1985) (quoting, in turn Teamsters v. United States, 431 U.S. 324, 336 (1977))). However, a plaintiff alleging pattern-and-practice discrimination "need not . . . establish that the employer followed a 'formal or express policy of discrimination.' " Hipp v. Liberty Nat. Life Ins. Co., 252 F. 3d 1208,

---

[11]   Moreover, as this Court has previously observed, the City is not responsible for changing the Rule of 3 to a Rule of 10—"the Legislature, not the City . . . changed the number on the list of eligibles." Smith et al. v. City of Mobile, Civ. Action No. 06-93-KD-M, 2007 WL 2580516, * 8 (Sep. 5, 2007); see also (Doc. 53-2, p. 9 (Weekley Dep. 21:16-18)).

n. 26 (11th Cir. 2001), <u>cert. denied</u>, 534 U.S. 1127 (2002) (quoting <u>Joe's Stone Crab, Inc.</u>, 220 F. 3d at 1285). Instead, "in a pattern and practice case, the plaintiff must prove, normally through a combination of statistics and anecdotes, that discrimination is the company's 'standard operating procedure.' " <u>Joe's Stone Crab, Inc.</u>, 220 F. 3d at 1274 (citing <u>Int'l Brotherhood of Teamsters v. United States</u>, 431 U.S. 324, 335-36 (1977)). Regardless of the method chosen, " [i]n order "to meet []his burden of proof, a plaintiff must prove more than the mere occurrence of isolated or accidental or sporadic discriminatory acts. [He] has to establish by a preponderance of the evidence that discrimination is the regular rather than the unusual practice." <u>Cooper</u>, 390 F. 3d at 724 (citing <u>Joe's Stone Crab, Inc.</u>, 220 F. 3d at 1274); <u>see also</u> <u>Austin v. City of Montgomery</u>, 196 Fed. Appx. 747 (11th Cir. 2006) (affirming lower court's grant of summary judgment to employer on a pattern-and-practice claim where the plaintiff-appellants "presented neither statistical evidence nor facts to support their pattern and practice claim, but rather conclusorily argued the isolated incidents that each of them experienced demonstrated a standard operating procedure of discrimination."). And although the absence of statistical evidence is not always fatal in pattern and practice cases, . . . when either statistical evidence or anecdotal evidence is missing altogether, the other must be correspondingly stronger." <u>Hipp</u>, 252 F. 3d at 1228 (internal citation and quotation marks omitted).

In an effort to establish motive, Hunter cites deposition testimony from Chief Dean's predecessor Ed Berger. (Doc. 51 at 11-12). According to Hunter, Berger's testimony reveals that the Fire-Rescue Chief, who, as a result of relatively recent changes, now serves at the Mayor's pleasure, is under pressure from the mayor and council members to promote minorities. (<u>Id</u>.). Hunter also argues that certain of Chief Dean's prior statements reveal that he is bent on promoting black individuals over white individuals without regard the their respective qualifications. (<u>Id</u>.).

Although Hunter cites no statistical evidence in support of his pattern and practice argument, he points to anecdotal evidence of discrimination: the <u>Silvester</u> case, in which, as noted above, a jury found that Trenier's promotion to Fire Administrator was motivated by racial discrimination; the <u>Stringfellow</u> jury's finding of intentional racial discrimination with respect to four white plaintiffs; and the undersigned's conclusion in <u>Smith</u> that two white plaintiffs had established a *prima facie* case of disparate treatment. (<u>See</u> Doc. 51, p. 21).

In denying the City's motion for summary judgment in the <u>Smith</u> case, this Court held that the juries' findings in <u>Silvester</u> and <u>Stringfellow</u> were probative regarding the pretext element of the plaintiffs' disparate treatment claim, reasoning that "the verdicts in the two prior cases, both of which involved the same decision-maker and promotional decisions among firefighters, are sufficiently related to the instant action that they may be considered . . . ." <u>Smith</u>, 2007 WL 2580516, at *8 (distinguishing <u>Denney v. City of Albany</u>, 247 F.3d 1172, 1181 (11th Cir. 2001)). Although pattern-and-practice claims are a variant of the disparate treatment theory, the two species of claims demand different proof. Disparate treatment claims may be based on an single episode of discrimination, while pattern-and-practice claims may not be based on "isolated" instances, but instead must be based on a discriminatory "standard operating procedure." <u>See</u> <u>Cooper</u>, 390 F. 3d at 724; <u>Joe's Stone Crab, Inc.</u>, 220 F. 3d at 1274. As noted above, the plaintiff attempts to make such a showing by presenting evidence that Chief Dean is under pressure from the mayor to promote minorities, regardless of their qualifications. (Doc. 51 at 11-12). But the City points out that the events giving rise to the <u>Silvester</u> and <u>Stringfellow</u> lawsuits occurred under the administration of Mayor Jones' predecessor. (Doc. 41, pp. 17-18). Accordingly, the jury findings of discrimination in those cases and this Court's holding in <u>Smith</u> have little probative value with respect to Hunter's

pattern-and-practice claim. See Hipp, 252 F. 3d 1228-29 (noting that a pattern-and-practice claim that "should not have been allowed to proceed" was based on "an amorphous 'policy' that was mainly implemented by one man . . . ."). The significance of this Court's Smith order is also attenuated because, in Smith, the undersigned found only that the plaintiffs had established a *prima facie* case of racial discrimination by presenting sufficient evidence of pretext; the Court did not determine that the City actually had discriminated against Smith and Glisson, and the plaintiffs did not move for summary judgment on that ground. See Smith, 2007 WL 2580516.

Moreover, as was the case with Hunter's disparate impact claim, statistical evidence is "missing altogether" from the plaintiff's pattern-and-practice claim. The three instances that the plaintiff points to pale in comparison to the 229 promotions that Mobile Fire Rescue has undertaken in past ten years. (Doc. 40-16, ¶ 2 (Dees Aff.) (Donald Dees, the Mobile County Personnel Board Personnel Director, stated that since April of 2000, Mobile Fire Rescue has had 229 promotions, exclusive of any civilian categorized promotions)).

Accordingly, the evidence presented is not strong enough to withstand summary judgment, see Hipp, 252 F. 3d at 1228, which is **GRANTED** to the City with respect to Hunter's pattern-and-practice claims.

### 2. Age Discrimination

Hunter also alleges age discrimination in violation of the Age Discrimination Employment Act of 1967, as amended, 29 U.S.C. § 621, et seq., and Alabama's Age Discrimination in Employment Act, Ala. Code. § 25-1-20 et seq. (the "Alabama ADEA") (Id. at ¶¶ 2 & 19). The same order and allocation of proof in cases under Title VII govern suits under the ADEA. Bonham v. Regions Mortgage, Inc., 129 F.Supp.2d 1315, 1321 (M.D.Ala.2001); see also Chapman v. AI

Transport, 229 F.3d 1012, 1024 (11th Cir.2000) (en banc).

The Alabama ADEA, states that "the remedies, defenses, and statutes of limitations, under this article shall be the same as those authorized by the federal Age Discrimination in Employment Act except that a plaintiff shall not be required to pursue any administrative action or remedy prior to filing suit under this article." Ala.Code § 25-1-29. And "because it is self-evident that the AADEA's purpose and prohibitions are like the ADEA's, to promote employment of older persons based on their ability rather than age and to prohibit arbitrary age discrimination in employment, it follows that [the ADEA's] principles should govern in AADEA cases as well." Bonham, 129 F.Supp.2d at 1321 (M.D.Ala.2001). Thus, the same order and allocation of proof in cases under Title VII govern suits under the Alabama ADEA. Bonham, 129 F. Supp. 2d at 1321; Dooley v. AutoNation USA Corp., 218 F.Supp.2d 1270 (N.D.Ala.2002).

The City points out, and Hunter does not dispute, that because his Charge of Discrimination fails to mention the promotions awarded to Meyers and Smith, Hunter is barred from asserting an age discrimination claim with respect to the promotions of those individuals. (See Doc. 41, p. 20, n. 7; Doc. 43-2 (EEOC Dismissal and Notice of Rights, Charge # 425-2008-00384)). Accordingly, summary judgment is **GRANTED** as to Hunter's ADEA claims based upon the City's promotion of Meyers and Smith. However, the plaintiff's age discrimination claims based on Meyers's and Smith's promotions are still viable under Alabama Code Section 25-1-29, which does not require administrative exhaustion as a prerequisite to suit.

The Supreme Court has stated that "[w]hen a plaintiff alleges disparate treatment, 'liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision.' That is, the plaintiff's age must have 'actually played a role in [the employer's

decisionmaking] process and had a determinative influence on the outcome.'" <u>Reeves v. Sanderson</u> <u>Plumbing Products, Inc.</u>, 530 U.S.133, 141 (2000) (citations omitted). Because Hunter lacks direct evidence that his age played a role in City's decision to promote Trenier, he must establish a *prima facie* case of age discrimination based on circumstantial evidence by showing: (1) that he was a member of the protected age group; (2) he was subjected to an adverse employment action; (3) he was qualified to do the job; and (4) he was treated less favorably than a similarly-situated individual outside his protected class. <u>Maynard v. Board of Regents of Div. of Universities of Florida Dep't</u> <u>of Educ. ex rel. University of South Florida</u>, 342 F.3d 1281, 1289 (11th Cir.2003); <u>see also</u> <u>Benson</u> <u>v. Tocco, Inc.</u>, 113 F.3d 1203, 1207-08 (11th Cir. 1997). The City does not contest that Hunter has established a *prima facie* case. Instead, it argues that he has failed to overcome the legitimate nondiscriminatory reasons they offer for promoting Trenier over Hunter.

Summary judgment is **DENIED** with respect to Hunter's ADEA claim based on Trenier's promotion and Hunter's Alabama ADEA claims based on each of the three deputy-chief promotions. The same evidence of pretext that casts doubt upon the City's legitimate, non-discriminatory reasons for promoting Trenier, a black candidate, over Hunter, applies with equal force to the City's decision to promote younger candidates over Hunter. In addition, a reasonable juror could conclude that Chief Dean's previous statement that he promoted Randy Smith "because [he (Chief Dean)] needed youthfulness down here," suggests a willingness to discriminate on the basis of age. (Doc. 54-3, pp. 2-3 (Tacon Dep. in <u>Stringfellow</u> litigation, at 23:18-24:18)); <u>see</u> <u>Ross</u>, 146 F. 3d at 1291.

## III. Conclusion

In accordance with the foregoing analysis, the City's motion for summary judgment (Doc. 39) is hereby **GRANTED in part** and **DENIED in part**.

**DONE** and **ORDERED** this the 18th day of **February, 2010.**

s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**